# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

|  |  |  |
|---|---|---|
| BETTY PERFECT, surviving spouse of<br>HAROLD PERFECT, deceased, | ) | |
| | ) | |
| Petitioner, | ) | Case No. CV 04-615-S-LMB |
| | ) | |
| v. | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| MICHAEL O. LEAVITT, Secretary of the | ) | |
| United States Department of Health and | ) | |
| Human Services,[1] | ) | |
| | ) | |
| Respondent. | ) | |

Currently pending before the Court is Petitioner Betty Perfect's Petition for Review. (Docket No. 15).  Petitioner seeks review of Respondent's determination that CIGNA Healthcare Medicare Administration followed the Medicare Secondary Payer statute, 42 U.S.C. § 1395y(b), and its corresponding regulations, in calculating the amount of Medicare's recovery from settlement proceeds received by Petitioner for the wrongful death of her husband, Medicare beneficiary Harold Perfect.  The action is brought pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1395ff.

Having carefully reviewed the record, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order.

---

[1]  Petitioner originally named Tommy G. Thompson as the Respondent in this action.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), because Mr. Thompson no longer holds the office of Secretary of Health and Human Services, Michael O. Leavitt, the current Secretary, is automatically substituted as the Respondent.

# I.

# BACKGROUND

A.   <u>**Regulatory Background**</u>

The Medicare Act is divided into two parts.  The primary benefits component, Part A, provides eligible individuals with medical coverage for hospital care and related post-hospitalization services.  42 U.S.C. §§ 1395c-1395i.  Part B is a voluntary program of supplemental medical insurance which partially covers outpatient care, laboratory testing, and ancillary medical services.  42 U.S.C. §§ 1395j-1395w.  The Secretary of Health and Human Services ("Secretary") contracts with private insurance companies ("intermediaries") to administer Medicare benefits, and then reimburses these intermediaries for the costs of claims administration.  42 U.S.C. §§ 1395h, 1395u.

In the present case, Harold Perfect received benefits under both Part A and Part B of the Medicare Act for medical care provided to him after Critical Care Systems administered a chemotherapy overdose that contributed to his death.  (AR 120).  CIGNA HealthCare Medicare Administration ("CIGNA") operated as the intermediary contracted by the Secretary to administer the Medicare program with regard to Harold Perfect's benefits.  (AR 37).

Under the Medicare Secondary Payer statute, intermediaries, such as CIGNA, can only pay for a service that has been or could be made by a third party if the intermediary's payment is "conditioned on reimbursement" when payment for the service has been made by the third party. 42 U.S.C. §§ 1395y(b)(2)(A), (b)(2)(B)(i).   Potentially responsible third parties include "liability insurance polic[ies] or plan [s]," such as the CNA Healthpro ("CNA") insurance plan carried by Community Care Services that paid out settlement proceeds to Petitioner to settle her

wrongful death claim.  *Id.*

When CNA, or any qualifying third party, subsequently pays for a service for which a conditional payment was made, Medicare can recover its conditional payments.  *See* 42 C.F.R. § 411.21 ("[c]onditional payment means a Medicare payment for services for which another payer is responsible"); 42 C.F.R. § 411.52 (if "services for which Medicare benefits have been claimed are for treatment of an injury or illness that was allegedly caused by another party, a conditional Medicare payment may be made").  However, Medicare will reduce its claim for reimbursement of the conditional payment to account for its share of the costs incurred in obtaining settlement from a third party.  42 C.F.R. § 411.37.

The parties here agree that Medicare made conditional payments totaling $146,469.41 for Harold Perfect's medical care and that third party CNA subsequently included recovery for the conditional payments in its settlement of Petitioner's wrongful death claim.  Thus, there is no dispute that Medicare is entitled to recover its conditional payments from the settlement proceeds paid to Petitioner.  The only issue is by what amount Medicare's recovery of these conditional payments should be reduced for the costs incurred by Petitioner in procuring settlement.  Medicare will allow a reduction of the amount owed to it for the costs of obtaining a settlement ("procurement costs"), but where, as here, the attorney's fees are less than one-third of the entire settlement, Medicare's reduction of the amount owed to it is based on a pro rata reduction of the percentage of the total settlement received.  42 C.F.R. § 411.37(c).

**B.      Factual Background**

Petitioner is the wife of the late Harold Perfect, a Medicare beneficiary who was diagnosed with cancer in September 1999.  (AR 134).  After this diagnosis, Mr. Perfect traveled

to Arkansas for chemotherapy and later returned to Idaho to continue treatment.  Critical Care

Systems administered the chemotherapy to Mr. Perfect in Idaho.  (AR 134).  Unfortunately, in

December, 1999, Critical Care Systems administered approximately four times the prescribed

amount of chemotherapy and Mr. Perfect died two months later.  (AR 135-36.)

Medicare, through CIGNA, paid for the medical services that Mr. Perfect received as a

result of the overdose.  (AR 145).  Medicare's payments for Mr. Perfect's care, however, were

conditioned on their repayment from any recovery or compensation received from a third party

as a result of the overdose and resulting death of Mr. Perfect.  (AR 145).  *See also* 42 U.S.C. §

1395y(b)(2)(A); 42 C.F.R. §§ 411.21, 411.52.  As explained above, CNA, as the insurer for

Community Care Services, is a qualifying third party from which Medicare can recover its

conditional payments.

On June 2, 2000, Petitioner consulted with attorney Terry Michaelson about her ability to

recover from Community Care Systems for her husband's death.  (AR 94).  At that time,

Petitioner had been communicating with CNA and was attempting to negotiate a settlement on

her own.  (AR 94-95).  It was not until these efforts failed, in September of 2001, that Petitioner

retained Mr. Michaelson to represent her with regard to any claims arising from the

chemotherapy overdose and resulting death of her husband.  Mr. Michaelson then took over

negotiations with CNA.  (AR 95).

On December 4, 2001, Mr. Michaelson sent a letter to Kenyan Floyd of CIGNA to notify

Mr. Floyd that he represented Petitioner and was prepared to file a lawsuit against Critical Care

for Harold Perfect's death.[2]  (AR 110).  Mr. Michaelson stated his "assumption that Cigna

---

[2]  Mr. Michaelson filed a complaint against Critical Care Systems on December 11, 2001.  (AR 132-38).

**MEMORANDUM DECISION AND ORDER - 4**

Medicare [would] participate in payment of all costs and legal fees incurred in recovering any amounts due for the wrongful death of Mr. Perfect." *Id*.

About one week later, Mr. Michaelson instructed an associate at his law firm, Eric Bean, to telephone Mr. Floyd.  The purpose of this call was to "ascertain whether [the law firm] could waive [their] fees due from the client . . . without affecting the legal fees Cigna/Medicare would pay." (AR 96).  According to Mr. Bean, when he asked if "Cigna/Medicare would object if [the firm] gave [Petitioner] a portion of the legal fees Cigna/Medicare would pay [the firm] for any settlement proceeds Cigna/Medicare received from the settlement," Mr. Floyd responded that "what [the firm] did with [its] fees was between [the firm] and [its] client." *Id*.

Mr. Bean telephoned Mr. Floyd a second time on or about December 18, 2001, pursuant to Mr. Michaelson's instruction, to have Mr. Floyd "confirm in writing that Cigna/Medicare would have no objection to the proposed distribution of settlement proceeds." (AR 97). Apparently Mr. Floyd advised Mr. Bean again that what the firm did about their own fees was between the firm and its client, but no written confirmation was ever provided to Mr. Bean or Mr. Michaelson.

On December 19, 2001, however, Mr. Floyd informed Mr. Michaelson by letter that Medicare's reimbursement amount from the settlement for its conditional payments "is reduced *by a* pro rata *share of procurement costs*." (AR 113) (emphasis added).  The letter advised Mr. Michaelson that it was "in [his], and [his] client's best interests to keep Medicare's payment and the obligation to satisfy Medicare's claim in mind when negotiating and accepting a final dollar amount in settlement." *Id*.  The letter also listed the amount of Medicare's conditional payments and advised Mr. Michaelson not to send a check to Medicare for reimbursement "**without**

MEMORANDUM DECISION AND ORDER - 5

**receipt of Medicare's final payment letter**."  (AR 114) (emphasis in original).  Mr. Floyd's

December 19, 2001 letter apparently crossed in the mail with a December 18, 2001 letter from

Mr. Michaelson informing Mr. Floyd that settlement "had been reached" in the amount of

$382,000 and calculating CIGNA's "reasonable attorney's fees" owing to Mr. Michaelson at

$48,823.14.   (AR 118).

On December 26, 2001, Mr. Michaelson wrote Mr. Floyd again asking if CIGNA would

approve his retention of one-third of Medicare's $146,469.41 conditional payments  "as and for

reasonable attorney fees."  (AR 115).  Although this letter was in response to Mr. Floyd's

December 19, 2001 letter informing Mr. Michaelson that procurement costs (which include

attorney's fees) are calculated on a pro rata basis, Mr. Michaelson did not address how the pro

rata sharing of procurement costs would impact his proposed distribution of the settlement

proceeds.

The original fee agreement between Petitioner and Terry Michaelson, executed in

September of 2001, was a contingency fee agreement.  This agreement provided that, if the filing

of a lawsuit was required,  Mr. Michaelson would retain one-third of the sums collected as

reasonable attorney fees.  (AR 102).  A December 18, 2001 letter from Mr. Michaelson to

Petitioner, however, appears to have amended this fee agreement.  Mr. Michaelson's letter

informed Petitioner that his "fees are being limited to one-third of the amount by which [he] was

able to increase the settlement offers made after [he] was originally consulted."  (AR 111).  Mr.

Michaelson calculated that he was able to increase the recovery by $109,353.73.  This

calculation was based on his assumption that Medicare would pay one-third of its $146,469.41

conditional payments for procurement costs.  Specifically, Mr. Michaelson stated that he

anticipated "receiving $48,823.14 in legal fees from the Medicare subrogation claim," and he included these legal fees in the total amount by which he believed he had increased Petitioner's recovery.[3] Finally, Mr. Michaelson's letter stated that he would retain one-third of the increased recovery amount, or $36,451.24, as attorney's fees. (AR 111).

On January 17 or 18, 2002, Mr. Floyd advised Mr. Michaelson by telephone that CIGNA would not pay more than the total costs of procurement, itemized in the December 18, 2001 letter at $36,451.24. (AR 98). Mr. Floyd also clarified that Medicare would not allow Mr. Michaelson to pass through to Petitioner any portion of the legal fees he charged Medicare.

In response to this information, Mr. Michaelson faxed Mr. Floyd a letter dated January 22, 2002, to inform Mr. Floyd that Petitioner "would prefer to see [Mr. Michaelson's] firm receive the legal fees, rather than allowing Cigna/Medicare to benefit from [his] offer to reduce the one-third contingency fee agreement." (AR 118). Mr. Michaelson notified Mr. Floyd that, in light of CIGNA's inability to allow him to distribute to Petitioner any portion of the procurement costs "charged to Medicare," his "offer to accept less than the firm is entitled to receive is withdrawn." (AR 119). Mr. Michaelson also indicated his position that he was "entitled to go forward with the settlement and to settle with Cigna/Medicare for two-thirds of its subrogation claim." (AR 119). In other words, Mr. Michaelson still believed Medicare would pay $48,823.14—an amount representing one-third of its conditional payments—as procurement costs.

---

[3] The other items included in the increased recovery calculation were for increases in CNA's settlement offers to Petitioner and her daughter. CNA had originally offered Petitioner $200,000 to settle the case and, after Mr. Michaelson became involved, the offer increased to $235,530.59. (AR 111). The offer to Petitioner's daughter increased from $50,000 to $75,000. *Id.* Thus, Mr. Michaelson arrived at the $109,353.73 total by adding $48,823.14 (Medicare's share of attorney's fees), $35,530.59 (Petitioner's increased settlement award), and $25,000 (the increase to Petitioner's daughter).

Mr. Michaelson concluded his January 22, 2002 letter by stating: "Unless I hear from you, a check will be sent to you in an amount of $97,646.27, representing two-thirds of the subrogation claim of Cigna/Medicare in the total amount of $146,469.41." (AR 119). On January 21, 2002, *before* Mr. Michaelson faxed his January 22, 2002 letter to CIGNA, CIGNA sent a demand letter to Mr. Michaelson stating that Petitioner owed Medicare $123,801.48, after a reduction for procurement costs.[4] (AR 120-22). Mr. Michaelson apparently received this letter on January 28, 2002. (AR 120). Despite the fact that Mr. Floyd's letter contained calculations that varied from the calculations Mr. Michaelson proposed in his January 22, 2002 letter, Mr. Michaelson continued in his belief that Medicare would pay him $48,823.14 in legal fees (or procurement costs) and, thus, Medicare was entitled to a recovery of only $97,646.27.

To that end, on February 12, 2002, Mr. Michaelson sent a letter to Mr. Floyd advising that if he did not hear from CIGNA he would "assume tender of the enclosed check [for $97,646.27] concludes the matter." (AR 125). In this same letter, however, Mr. Michaelson also stated his understanding that, based on a recent telephone conversation with Mr. Floyd, his entitlement to fees and costs would be recalculated after Mr. Floyd received a copy of the September 2001 fee agreement. (AR 124). Without waiting for this recalculation, Mr. Michaelson sent CIGNA a check in the amount of $97,646.27, the amount he believed was due to Medicare and not the $123,801.48 CIGNA had requested in its January 21, 2002 demand letter. (AR 120-22).

---

[4] The total amount of recovery requested in this demand letter was based on CIGNA's belief that settlement had been reached and that Petitioner had been charged a one-third contingency fee on the proceeds. (AR 87). The amount requested by CIGNA was later increased. (AR 76, 86-90, 126-28).

**MEMORANDUM DECISION AND ORDER - 8**

C.    **Procedural History**

CIGNA deposited the $97,646.27 check from Mr. Michaelson (AR 99) and did not send

any more correspondence, notices, or demand letters until June 18, 2002, when it sent an "Intent

to Refer Debt" letter demanding payment for a balance of $51,518.58.[5]  (AR 126-28).  On July 5,

2002, Mr. Michaelson sent CIGNA a letter contesting the debt.  (AR 94-100).  CIGNA took the

position that Mr. Michaelson's defense to the debt did not constitute a valid, documented defense

and it again demanded payment for the outstanding balance.  (AR 92).  Mr. Michaelson

requested reconsideration of this decision (AR 86), and on September 27, 2002, a CIGNA officer

issued a reconsideration determination.  (AR 86-90).  This decision determined that the total

procurement costs were $11,783.53, and recalculated the amount due to Medicare as $41,499.67,

plus interest.   Petitioner next requested an in-person hearing with CIGNA; CIGNA granted

Petitioner's request on January 24, 2003.  (AR 82-83).  On February 21, 2003, a CIGNA hearing

officer issued a decision partially favorable to Petitioner.  (AR 72-78).  The officer determined

that attorney fees and total procurement costs amounted to $36,451.24, and accordingly reduced

the amount of Medicare's recovery to $34,176.20.  (AR 76-77).

Petitioner requested a hearing before an Administrative Law Judge ("ALJ") to review

CIGNA's February 21, 2003 decision.  (AR 70-71).  ALJ Rand G. Farrar held a hearing on May

5, 2004, at which time Petitioner appeared and testified.  (AR 147-88).  Terry Michaelson and

Eric Bean represented Petitioner and also provided testimony at the hearing.  (AR 35, 148).

The ALJ found that Petitioner's attorney charged $36,451.24 for his efforts in attempting

to increase Petitioner's insurance settlement.  (AR 37-38).  Thus, the ALJ determined that

_____

[5] CIGNA calculated the amount owing to Medicare by subtracting the $97,646.27 payment by
Mr. Michaelson from the $146,469.41 total recovery amount, then subtracting an amount for Medicare's
pro rata share of attorneys' fees, and adding interest to the difference.

CIGNA correctly calculated the amount of Medicare's recovery claim against the settlement proceeds, a calculation that was based on a pro rata share of 10% of Medicare's total recovery, calculated using the $36,451.24 listed in Mr. Michaelson's December 18, 2001 letter as total procurement costs (and not the $48,823.14 that Mr. Michaelson had argued was the proper amount of attorney's fees).  (AR 35, 40).  The Appeals Council denied Petitioner's request for review of the ALJ's decision.  (AR 1-2, 17).

After completing the administrative review process, Petitioner filed a Petition for Review with this Court.   (Docket No. 1).  Petitioner argues that there is no substantial evidence in the record to support CIGNA's calculation of Medicare's recovery amount.  *Petitioner's Reply*, p. 1 (Docket No. 15).  Petitioner also argues that Respondent should be equitably estopped from pursuing any recovery in excess of $97,646.27.  *Id.*  at p. 4.

## II.

## DISCUSSION

## A.   <u>Equitable Estoppel</u>

Petitioner argues that Medicare should be estopped from pursuing any recovery in excess of $97,646.27 because Mr. Michaelson and his law firm relied on Mr. Floyd's verbal representations that the law firm could decide how to apportion attorney's fees with their client.[6]

---

[6] The Petition for Review does not contain a claim for equitable estoppel, however, Petitioner argued before the ALJ that her attorney "justifiably relied on" Mr. Floyd's representations, (AR 19), and the ALJ noted in his decision that Petitioner had argued "that Medicare reimbursement of $97,646.27 was correct," (AR 40).  Although the ALJ's decision does not specifically rule on Petitioner's equitable estoppel claim, the ALJ implicitly rejected this claim by determining that Medicare had correctly calculated the procurement costs, overpayment, and interest related to Petitioner's settlement.  Accordingly, the Court will consider Petitioner's equitable estoppel claim and will determine if the ALJ's rejection of Petitioner's estoppel argument is free from legal error.  *See, e.g., Mukherjee v. INS*, 793 F.2d 1006, 1009 (9th Cir. 1986) (ruling on equitable estoppel claim as a matter of law); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (explaining that a court may overturn the ALJ's decision if it is based on legal error).

**MEMORANDUM DECISION AND ORDER - 10**

*Petitioner's Brief*, p. 15 (Docket No. 13).  The equitable estoppel claim will be considered first because, in essence, it is a request to preclude Respondent from applying the Medicare procurement cost regulations to this case.  It is only if Respondent cannot be equitably estopped from claiming recovery costs in excess of $97,646.27 that the Court must determine whether the ALJ's decision that CIGNA correctly calculated the appropriate reimbursement amount under Medicare's regulations is supported by substantial evidence.

> **1.      Standards of Law**

Equitable estoppel may be imposed as a defense by a party who, ignorant of certain facts, relies to his injury on the conduct of another who knows those facts and intends that his conduct be relied upon by the injured party.  *Jablon v. United States*, 657 F.2d 1064, 1067 (9th Cir. 1981).  These general requirements for estoppel of a private party, however, "are neither conclusive nor exhaustive when one seeks to bind the government."  *Morgan v. Heckler*, 779 F.2d 544, 545 (9th Cir. 1985).  Beyond the four traditional elements of estoppel, estoppel against the government must rest upon affirmative misconduct going beyond mere negligence.  *Id.*  This "affirmative misconduct" requirement is not satisfied by proof of a "mere failure to inform or assist."  *Wagner v. Director, FEMA*, 847 F.2d 515, 519 (9th Cir. 1988) (citation and internal quotation marks omitted).  Instead, it requires a showing of affirmative misconduct, which could include a "deliberate lie or a pattern of false promises."  *Socop-Gonzalez v. INS*, 272 F.3d 1176, 1184 (9th Cir. 2001) (en banc) (citation and internal quotation marks omitted).

While there is no requirement that the Government intend to mislead a party, *Jablon*, 657 F.2d at 1067, n.5, "[p]ersons dealing with the government are charged with knowing government statutes and regulations, and they assume the risk that government agents may exceed their authority and provide misinformation," *Mukherjee v. INS*, 793 F.2d 1006, 1009 (9th Cir. 1986).

**MEMORANDUM DECISION AND ORDER - 11**

Additionally, the Government cannot be estopped by the unauthorized acts of its agents. *Saulque v. United States*, 663 F.2d 968, 976 (9th Cir. 1981). Moreover, even where affirmative misconduct has been proved, "estoppel will only apply where the Government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability." *Morgan*, 779 F.2d at 545.

2.     **Discussion**

Eric Bean testified before the ALJ that he telephoned Mr. Floyd and asked him if the law firm could reduce their fees or pass a portion of their fees on to the client. (AR 167-68). As noted on page five (5) of this decision, according to Mr. Bean, Mr. Floyd responded by stating that "what you do with your fees is between you and your client." (AR 168). Again, as noted above, one week later Mr. Bean contacted Mr. Floyd who, according to Mr. Bean, confirmed that "[w]hat you do with your fees is between you and your client." (AR 172). Mr. Michaelson explains that it was his understanding from the conversations between Eric Bean and Mr. Floyd that "Cigna/Medicare would pay 1/3 of its claim for legal fees pursuant to the contingency fee agreement, and that it would be permissible for the Firm to pay a portion thereof to [Petitioner]." *Petitioner's Brief*, p. 5 (Docket No. 13); (*see also* AR 96-97). Mr. Michaelson also testified that on January 17 or 18, 2002, Mr. Floyd agreed with Mr. Michaelson's statement that Medicare "will either pay [$48,823.14], representing one-third of its total claim, or [$36,451.24], if that is the actual amount that we're charging the client, whichever is *more*."[7] (AR 172) (emphasis added). These representations form the basis for Petitioner's equitable estoppel claim.

With all of this evidence being carefully considered, the unauthorized representations of

---

[7] Mr. Michaelson's July 5, 2002 letter explains his understanding from his conversation with Mr. Floyd that Medicare would pay the $48,823.14 representing one-third of its subrogation claim, or the $36,451.24 in actual costs, "whichever was *less*." (AR 98) (emphasis added).

**MEMORANDUM DECISION AND ORDER - 12**

an agent do not provide a basis to equitably estop Respondent in this case.  It is well established that the Government cannot be estopped by unauthorized acts of its agents, *Mukherjee*, 793 F.2d at 1009; *Saulque*, 663 F.2d at 976, and Petitioner has presented no evidence that Respondent authorized Mr. Floyd's asserted oral representations, *Saulque*, 663 F.2d at 974 (explaining that "one who relies on the act of a government agent *must show* that the agent acted within his authority") (emphasis added).

Additionally, courts have been reluctant to equitably estop the Government based solely on oral representations.  *See, e.g., Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 65 (1984) (explaining that the appropriateness of the respondent's reliance on a Medicare fiscal intermediary's advice was undermined, in part, because the advice was oral); *Schweiker v. Hansen*, 450 U.S. 785, 788 (1981) (per curiam) (expressing concern that the Government not be estopped from enforcing eligibility requirements "because of possibly erroneous replies to oral inquiries").  This rationale is especially compelling here where CIGNA provided *written* notice informing Petitioner's counsel that Medicare would contribute only a pro rata share of procurement costs.[8]  (AR 113).

It is also well established that "[p]ersons dealing with the government are charged with knowing government statutes and regulations." *Mukherjee*, 793 F.2d at 1009.  Here, both Medicare's regulations and the written notice provided to Mr. Michaelson by CIGNA explain that Medicare will pay only a pro rata share of the procurement costs.  *See* (AR 113) (December

---

[8]  Additionally, although Mr. Michaelson explained that he had Mr. Bean telephone Mr. Floyd on December 18, 2001 because he "wanted to confirm in writing" that CIGNA would not oppose the proposed settlement distribution, (AR 97), he proceeded with distribution of the settlement without obtaining CIGNA's written confirmation of his proposed distribution.  In fact, the only written statement from CIGNA stated that Medicare was owed $123,801.48, (AR 120-22), and not the $97,646.27 proposed by Mr. Michaelson.

**MEMORANDUM DECISION AND ORDER - 13**

19, 2001, letter from Mr. Floyd to Mr. Michaelson specifically stating that "Medicare's reimbursement is *reduced by a pro rata share of procurement costs*") (emphasis added); 42 C.F.R. § 411.37(c) (providing that Medicare's recovery against the settlement is computed by determining the ratio of the procurement costs (attorneys' fees) to the total judgment or settlement payment; applying this ratio to the Medicare payment to determine Medicare's share of procurement costs, and then subtracting Medicare's share of procurement costs from Medicare's conditional payments); *id.* at § 411.37(a)(ii) (explaining that Medicare calculates its share of procurement costs based on the "costs borne by the party against which CMS seeks to recover").

Accordingly, Mr. Michaelson's position that he would receive $48,823.14 (an amount one-third of Medicare's conditional payments) from Medicare as its portion of legal fees, *Petitioner's Brief*, p. 5 (Docket No. 13), is in conflict with Medicare's regulations. Mr. Michaelson continued in this belief despite the fact that written notice from CIGNA and the Medicare regulations provided otherwise. For all of these reasons, Petitioner cannot establish, as a matter of law, a claim for equitable estoppel against Respondent based on the conduct of Mr. Floyd. *See, e.g., Heckler*, 467 U.S. at 66 (noting that the regulations governing Medicare's cost reimbursement should and did put respondent on ample notice of its responsibilities in preparing reports, and commenting that respondent instead prepared its reports on the basis of an oral policy judgment by an official who, it should have known, was not in the business of making policy).

**B.**     **Procurement Costs**

Petitioner's alternative basis for recovery is that there is no substantial evidence in the record to support CIGNA's calculation of Medicare's recovery amount using $36,451.24 as the

**MEMORANDUM DECISION AND ORDER - 14**

amount of procurement costs.  *Petitioner's Reply*, p. 1 (Docket No. 15).  As explained above, the

only issue is by what amount Medicare's conditional payments totaling $146,469.41 should be

reduced for procurement costs.  Petitioner claims that $48,823.14 should be considered the

amount charged for procurement costs.  The actual and proposed distributions of the $382,000

settlement and related procurement costs are illustrated as follows:

|  | Mr. Michaelson's Actual Distribution of Settlement Proceeds | Petitioner's Proposed Distribution | CIGNA/Medicare's Proposed Distribution (upheld by the ALJ) |
|---|---|---|---|
| **Petitioner** | $235,530.59 | $235,530.59 | $235,530.59 |
| **Medicare ($146,469.41 minus procurement costs)** | $97,646.27 | $127,750.52 | $131,822.47 |
| **Procurement Costs charged to Medicare** | $48,283.14 | $18,718.79 | $14,646.94 |
| **Basis for Procurement Costs** | one-third of Medicare's total recovery of $146,469.41 | Pro rata share of 12.78% of Medicare's recovery, based on attorneys' fees in the amount of $48,283.14 | Pro rata share of 10% of Medicare's recovery, based on attorneys' fees in the amount of $36,451.24 |
| **Record cites** | (AR 48) | (AR 44-46) | (AR 37, 39, 111) |

1.      **Standards of Law**

The Court is authorized by 42 U.S.C. § 405(g) "to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing" the Secretary's decision,

"with or without remanding the case for a rehearing."  *See also* 42 U.S.C. § 1395ff(b)(1)(A)

(providing for judicial review of the Secretary's final decision as is set forth in section 405(g)).

The findings of the Secretary as to any fact, if supported by substantial evidence, are conclusive.

42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). *See also Katz v. Sec'y of Health & Human Servs.*, 972 F.2d 290, 292 (9th Cir. 1992).

### 2.   Discussion

When Medicare payments are less than the judgment or settlement amount, as in the present case, Medicare's recovery against the settlement is computed by: (1) determining the ratio of the procurement costs (attorneys' fees) to the total judgment or settlement payment; (2) applying this ratio to the Medicare payment to determine Medicare's share of procurement costs; and then (3) subtracting Medicare's share of procurement costs from Medicare's conditional payments. 42 C.F.R. § 411.37(c). The remainder is Medicare's recovery amount.

Petitioner does not claim that the ALJ failed to follow this formula, but rather that the ALJ used the incorrect amount of procurement costs to calculate Medicare's recovery. The ALJ determined that attorney's fees and total procurement costs for the settlement were $36,451.24, the amount listed in Mr. Michaelson's December 18, 2001 letter to his client. (AR 37). This letter informed Petitioner that Mr. Michaelson was limiting his fees "to one-third of the amount by which [he] was able to increase the settlement offers made after [he] was originally consulted." (AR 111). Mr. Michaelson calculated that he was able to increase the total recovery by $109,353.73,[9] and stated that he would retain only one-third of this amount, or $36,451.24, for attorney's fees, (AR 111), instead of charging a full one-third of the settlement as provided

---

[9] The other items included in the increased recovery calculations were for increases in CNA's settlement offers to Petitioner and her daughter. CNA had originally offered Petitioner $200,000 to settle the case and, after Mr. Michaelson became involved the offer increased to $235,530.59. (AR 111). The offer to Petitioner's daughter increased from $50,000 to $75,000. *Id.* Thus, Mr. Michaelson arrived at the $109,353.73 total by adding $48,823.14 (Medicare's share of attorney's fees), $35,530.59 (Petitioner's increased settlement award), and $25,000 (the increase to Petitioner's daughter).

**MEMORANDUM DECISION AND ORDER - 16**

for in the September 2001 contingency fee agreement.

Mr. Michaelson's calculation of the amount he had increased the settlement, however, was based on his assumption that Medicare would pay $48,823.14 for procurement costs. When he learned in January of 2002 that CIGNA would not pay more than the total costs of procurement (itemized in the December 18, 2001 letter at $36,451.24), Mr. Michaelson sent a letter, dated January 22, 2002, to Mr. Floyd notifying him that his December 18, 2001 "offer to accept less than the firm is entitled to receive is withdrawn."[10]  (AR 119).  Mr. Michaelson also indicated his position that he was "entitled to go forward with the settlement and to settle with Cigna/Medicare for two-thirds of its subrogation claim."  (AR 119).  In other words, Mr. Michaelson still believed Medicare would pay $48,823.14—an amount representing one-third of its conditional payments—as procurement costs.

Mr. Michaelson argues that, although his December 18, 2001 letter indicates he would take only $36,451.24 as attorney's fees, this is not what actually happened.  *Petitioner's Brief*, p. 13 (Docket No. 13); *Reply Brief*, p. 2 (Docket No. 15).  Instead, Mr. Michaelson distributed the $382,000 in settlement funds by sending a check to CIGNA in the amount of $97,646.27 (the amount he believed was due to Medicare after a reduction of $48,823.14 for procurement costs) and a check to Petitioner in the amount of $235,530.39.  (AR 49-50, 99).  Mr. Michaelson retained $48,823.14.  Mr. Michaelson argues that this demonstrates Petitioner was charged a fee of $48,823.14, and not the $36,451.24 referred to in his December 18, 2001 letter.  *Petitioner's Reply*, p. 2 (Docket No. 15).

---

[10]  Although Mr. Michaelson asserted in the letter that he was withdrawing his December 18, 2001 offer to reduce the one-third contingency fee agreement, he did not re-impose the terms of the September 2001 contingency fee agreement, nor did he charge Petitioner a fee of one-third the total settlement amount.  (AR 118).

**MEMORANDUM DECISION AND ORDER - 17**

These calculations, however, do not indicate that *Petitioner* was charged a fee of $48,823.14. Instead, the $48,823.14 was withheld from sums collected in the settlement as recovery for Medicare's conditional payments amounting to $146,469.41. As the ALJ determined, "the overarching facts do not support [Mr. Michaelson's] contention that he should be allowed to report procurement costs to Medicare that are more than the actual costs billed to Petitioner in this case." (AR 40).

Mr. Michaelson's December 18, 2001 letter explained that CNA had agreed to increase its settlement offer to Petitioner to $235,530.59. Subtracting that amount from the total settlement of $382,000, leaves the sum of $146,469.41—the exact amount of Medicare's conditional payments. When Mr. Michaelson distributed the settlement proceeds, Petitioner received all of the amount allocated to her, $235,530.59, *without a reduction for attorney's fees*. In contrast, the check Mr. Michaelson sent to CIGNA reduced Medicare's $146,469.41 recovery by a full one-third, or $48,823.14. Although Petitioner argues that this amount was retained by Mr. Michaelson as attorney's fees/procurement costs, it was withheld solely from funds attributable to Medicare's claim and not those attributable to Petitioner's settlement proceeds. Procurement costs are defined as those "borne by the *party* against which [Medicare] seeks to recover," here, the Petitioner. 42 C.F.R. § 411.37(a)(ii) (emphasis added). It does not appear that Petitioner has, or will, bear much, if any, of the cost for procuring settlement.

The fact that Petitioner will not be paying any part of her $235,530.59 settlement award toward procurement costs is confirmed by Mr. Michaelson's testimony. He advised the ALJ that Petitioner "is not going to pay one dime on this thing," because his law firm will "be solely responsible for whatever penalties or amounts that need[] to be reimbursed." (AR 178-79). In effect then, some of the $48,823.14 retained by Mr. Michaelson represents sums that were owing

**MEMORANDUM DECISION AND ORDER - 18**

to Medicare but were withheld from Medicare's recovery amount by Mr. Michaelson based on his belief that Medicare would pay one-third of its recovery for attorney's fees.  Because some of the retained funds were (and are) owing to Medicare as part of its recovery at the time Mr. Michaelson issued the check to CIGNA, the fact that Mr. Michaelson characterized his retention of the funds as "attorneys' fees" does not change the character of the funds.

In other words, while part of the $48,823.14 represented procurement costs, some of that amount was actually part of the recovery owed to Medicare for its conditional payments.[11] Accordingly, despite the actual distribution of funds, the ALJ's determination that CIGNA correctly calculated procurement costs at $36,451.24 is supported by substantial evidence in the record, *i.e.*, the last written statement of the amount of attorney's fees found in Mr. Michaelson's December 18, 2001 letter, because nothing in the record establishes that Mr. Michaelson charged *Petitioner* a greater amount for procurement costs.  *See* 42 C.F.R. § 411.37(a)(ii) (explaining that the procurement costs are those "borne by the party against which [Medicare] seeks to recover").

The evidence upon which the ALJ relied can reasonably and rationally be relied on to support his conclusions, despite the fact that such evidence may be susceptible to a different interpretation.  "If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary." *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).  For this reason, the Petition for Review is denied.

---

[11]  At the time Mr. Michaelson distributed the settlement proceeds, Medicare had already claimed that it was owed $123,801.48, after a reduction for procurement costs.  (*See* AR 120-22 (January 21, 2002 demand letter)).  Thus, CIGNA had already made a claim against part of the $48,823.14 that Mr. Michaelson decided to retain.

**MEMORANDUM DECISION AND ORDER - 19**

## III.

## ORDER

Accordingly, IT IS HEREBY ORDERED that the Petition for Review (Docket No. 1) is

DENIED.  This action is dismissed in its entirety.



DATED:  **March 30, 2006**.

Honorable Larry M. Boyle
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 20**